**In re Edward B. BERKELHAMMER & Joellen Berkelhammer, Debtors.**

**Edward M. Berkelhammer, Plaintiff,**

**v.**

**Anotonia C. Novella, as Commissioner of the New York State Department of Health, Defendant.**

**Bankruptcy No. 01–14772 (AJG).**
**Adversary No. 02–8033A.**

United States Bankruptcy Court,
S.D. New York.

June 13, 2002.

---

Law Offices of Barton P. Levine, by Barton P. Levine, New York City, for Debtor.

Eliot Spitzer, Attorney General of the State of New York, by Neal S. Mann, Assistant Attorney General, New York City, for Antonia C. Novella, as Commissioner of the New York State Department of Health.

## MEMORANDUM OPINION ON MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

ROBERT D. DRAIN, Bankruptcy Judge.

Debtor and plaintiff Edward M. Berkelhammer (the "Debtor" or "Dr. Berkelhammer") has sought an injunction pursuant to section 105 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, requiring defendant Antonia C. Novella (the "Commissioner"), as Commissioner of the New York State Department of Health ("NYSDH") to refrain from violating section 525(a) of the Bankruptcy Code and, consistent therewith, to (i) cause the Debtor's name to be removed from the "Excluded or Restricted Provider List" of the NYSDH's Medical Assistance Program ("Medicaid Program"), (ii) designate the Debtor as a "full participating Provider" within the meaning of the Medicaid Program, (iii) and promptly take all necessary steps to notify Debtor's employer, Kings County Hospital Center, of such actions.

This proceeding was originally brought only against the NYSDH. At the hearing on NYSDH's motion to dismiss under Fed. R.Civ.P. 12(b)(1), (6), made applicable herein by Bankruptcy Rule 7012, NYSDH agreed (a) to deem the complaint to be amended to add a responsible officer of NYSDH as a defendant and to delete NYSDH as a defendant and (b) to deem the Debtor's pleadings to be a motion for summary judgment pursuant to Fed. R.Civ.P. 56, made applicable herein by Bankruptcy Rule 7056. The parties have now entered into a stipulation memorializing those agreements, and pursuant thereto the Debtor's amended complaint names the Commissioner, as a responsible officer of NYSDH, as the sole defendant.[1]

The parties agreed that there were no disputed issues as to any relevant, material fact and that the respective motions could be decided on the pleadings.

### FACTS

The Debtor filed for relief under chapter 7 of the Bankruptcy Code on August 28,

---

1. NYSDH's agreement commendably reduced the need for additional litigation in this no-asset chapter 7 case and, as discussed below, has avoided the Court's need to address, head on, certain constitutional issues pertaining to sovereign immunity and the Eleventh Amendment. *See, e.g.,* 28 U.S.C. § 2403(a).

2001. Since 1990 and continuing during his chapter 7 case, he has been a staff psychiatrist at Kings County Hospital Center in Brooklyn, New York. This employment provides most of his household income and health, disability and life insurance and pension benefits.

Dr. Berkelhammer does not provide services or supplies to Medicaid recipients. Nevertheless, in 1998 Kings County Hospital Center informed him that for it to comply with applicable NYSDH Medicaid Program guidelines, all of its staff physicians must be deemed "Medicaid eligible;" physicians excluded from or ineligible for the Medicaid Program would be terminated unless they promptly became eligible. This was important to Dr. Berkelhammer because he had not been eligible for the Medicaid Program since May 8, 1992.

At that time, he had entered into a Stipulation of Settlement with the New York State Department of Social Services in which he agreed (a) to be excluded from the Medicaid Program with leave to reapply after August 14, 1992, and (b) to pay $127,392.77 in respect of alleged Medicaid overpayments. This Stipulation of Settlement stated that it was not "an admission by [Dr. Berkelhammer] of the accuracy or validity of any of the claims, facts, or findings asserted [against him], or of any willful misconduct, knowing violation of generally accepted medical practice or of any knowing violation of the requirements of the Medicaid program." Indeed, the record contains no suggestion that Dr. Berkelhammer has ever engaged in any misconduct or any knowing violation of the Medicaid Program.

Although the 1992 Stipulation of Settlement stated that Dr. Berkelhammer's $127,392.77 monetary obligation would be "enforceable in the same manner, and with like effect, as that prescribed for final administrative judgments by Section 145 a of the Social Services Law," Dr. Berkelhammer did not pay that obligation. Nor did NYSDH seek to collect the amount owed it. For his part, Dr. Berkelhammer was content to remain on the "Medicaid ineligible list" because his practice did not require him to provide services to Medicaid recipients. Being on the "Medicaid ineligible list" was not a concern until Kings County Hospital Center required in 1998 that he become eligible again or lose his job.

On July 13, 1998, Dr. Berkelhammer and the NYSDH entered into a Reinstatement Agreement pursuant to which Dr. Berkelhammer agreed to pay NYSDH $120,000 in equal monthly installments over ten years and NYSDH reinstated his Medicaid privileges. The Reinstatement Agreement provided that the foregoing obligation was nonrecourse to Dr. Berkelhammer, the only remedy for his default being NYSDH's right to revoke Dr. Berkelhammer's Medicaid privileges. The Reinstatement Agreement provides that NYSDH cannot issue a notice of default until a monthly installment is over 30 days late, and that Dr. Berkelhammer has an additional 30–day grace period before NYSDH can act to terminate his privileges.

For the next three years Dr. Berkelhammer made payments under the Reinstatement Agreement. He filed for relief under chapter 7 for multiple reasons, including tax liabilities. Counsel for the Debtor thereafter gave NYSDH notice of the commencement of the Debtor's chapter 7 case, of the fact that he had instructed the Debtor not to make further payments under the Reinstatement Agreement (as NYSDH was a prepetition creditor), and of the deadline for objecting to the Debtor's discharge. In response, and without obtaining relief from the automatic stay under section 362 of the Bankruptcy Code,

NYSDH sent Dr. Berkelhammer a notice of default under the Reinstatement Agreement. NYSDH did not file a proof of claim in the chapter 7 case and did not object to the Debtor's discharge. The order granting the Debtor's discharge under section 727 of the Bankruptcy Code was issued on January 18, 2002.

On February 19, 2002, NYSDH issued a letter to Dr. Berkelhammer notifying him that it had terminated his participation in the Medicaid Program, effective November 24, 2001, thirty days after its issuance of the default notice. The *only* reason for this action, for which NYSDH did not seek relief from the Court, was Dr. Berkelhammer's cessation of payments under the Reinstatement Agreement upon the start of his chapter 7 case. This adversary proceeding ensued. Kings County Hospital Center has informed Dr. Berkelhammer that the termination of his employment is imminent if he remains "Medicaid ineligible."

## DISCUSSION

The Commissioner contends that this proceeding should be dismissed because (i) the Court lacks jurisdiction over her in light of NYSDH's sovereign immunity under the Eleventh Amendment and (ii) the amended complaint fails to state a claim. The latter contention is based on the position that (a) 28 U.S.C. § 959(2) required the Debtor to comply with the Reinstatement Agreement postpetition, (b) the Reinstatement Agreement was an executory contract that could be assumed only by curing the monetary default, which the Debtor has not done, and (c) the Debtor's nonrecourse obligation to NYSDH is not subject to section 525(a) of the Bankruptcy Code.

### Sovereign Immunity and Ex parte Young

While the United States Supreme Court has in recent years clarified the expansive scope of the states' sovereign immunity, it has continued also to recognize the validity of the *Ex parte Young* exception to that doctrine. *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 1131 n. 16, 134 L.Ed.2d 252 (1996): "We have already seen that several avenues remain open for ensuring state compliance with federal law.... Most notably, an individual may obtain injunctive relief under *Ex parte Young* [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)] in order to remedy a state officer's ongoing violation of federal law." *See also Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 2262–63, 144 L.Ed.2d 636 (1999) (*Ex parte Young* exception is an essential part of sovereign immunity doctrine).

*Ex parte Young* permits prospective relief against state officers based on the fiction that such a suit is not an action against a "state" but, rather, is meant to prevent an individual's continuing violation of federal law. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 2034, 138 L.Ed.2d 438 (1997). There are exceptions to this fiction, however: "The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleadings." *Id.* For the *Young* doctrine to apply, the suit must truly be for prospective relief, not, for example, for the recovery of money from the state for a past violation. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). Relatedly (although the actual application of this limitation is less clear), the court must not intrude upon "special sovereignty interests" of the state (*Coeur d'Alene*, 117 S.Ct. at 2040): "Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy

upon funds in its Treasury.... The dignity and status of its statehood allows Idaho to rely on its Eleventh Amendment immunity and to insist upon responding to these [quiet title] claims in its own courts...." *Id.* at 2043.[2] Finally, there must not be an existing federal remedial scheme that is so detailed as to preclude the application of judicially created equitable remedies.

**2.** A majority of the Court in *Coeur d'Alene* agreed that engaging in a "case-specific analysis of a number of concerns, including whether a state forum is available to hear the dispute, what particular federal right the suit implicates, and whether 'special factors counsel for hesitation' in the exercise of jurisdiction ... unnecessarily recharacterizes and narrows much our *Young* jurisprudence," which is "a straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." 117 S.Ct. at 2045 (O'Connor, Scalia and Thomas, JJ., concurring in part); *id.* at 2047 (Souter, Stevens, Ginsberg and Breyer, JJ., dissenting).

**3.** For this reason, it need not be determined whether the sections of the Bankruptcy Code invoked by the Debtor are unconstitutional limitations on NYSDH's sovereign immunity. As noted by courts and commentators, the blanket invocation and application of sovereign immunity could have a devastating effect on the operation of the Bankruptcy Code and the bankruptcy process. *See generally* Klee, Johnston and Winston, "State Defiance of Bankruptcy Law," 52 Vand. L.Rev. 1527, 1535 (1999) ("Without change, the system is likely to crumble or, at a minimum, produce vastly different and inequitable results in cases in which states take an active role. One greedy governmental creditor can undo all the good for literally millions of debtors, creditors, employees, and communities.").
The scope of sovereign immunity with respect to the Bankruptcy Code is not clear in this Circuit or generally. *Compare Ohio Agri. Commodity Depositors Fund v. Mahern,* 517 U.S. 1130, 116 S.Ct. 1411, 134 L.Ed.2d 537 (1996) (vacating and remanding "for further consideration in light of *Seminole Tribe*" Seventh Circuit decision validating section 106(a) of the Bankruptcy Code's abrogation of sovereign immunity); *Sacred Heart Hosp. v. Pennsylvania,* 133 F.3d 237, 243–44 (3d Cir.1998)

*Seminole Tribe,* 517 U.S. at 74, 116 S.Ct. 1114. "Our precedents do teach us, nevertheless, that where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." *Coeur d'Alene,* 117 S.Ct. at 2038.

■ *Ex parte Young* applies to this proceeding.[3] The Debtor has sought prospec-

and *Maryland v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777, 786–87 (4th Cir. 1997); *Texas v. Walker,* 142 F.3d 813, 820–23 (5th Cir.1998), *cert. denied,* 119 S.Ct. 865 (5th Cir.1999); *In re Zywiczynski,* 210 B.R. 924, 930–32 (Bankr.W.D.N.Y.1997) (jurisdiction of bankruptcy courts over debtor and estate permits at least certain determinations as to rights in, estate's use of, and interference with property of the estate and debtor's discharge, if not affirmative relief); *California and State Lands Commission v. Deep Sea Research, Inc.,* 523 U.S. 491, 507, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998) (limited *in rem* exception to sovereign immunity). *But see United States v. Nordic Village, Inc.,* 503 U.S. 30, 38–9, 112 S.Ct. 1011, 1017, 117 L.Ed.2d 181 (1992) ("[W]e have never applied an *in rem* exception to the sovereign-immunity bar against monetary recovery, and have suggested that no such exception exists."); *In re Fernandez,* 123 F.3d 241, 243–44 (5th Cir.1997) (even where federal government has exclusive control over area of law, such as bankruptcy, Eleventh Amendment applies). *See generally,* Gerson, "A Bankruptcy Exception to Eleventh Amendment Immunity: Limiting the *Seminole Tribe* Doctrine," 74 Am. Bankr.L.J. 1 (2000) (noting Supreme Court's frequent post-*Seminole* denial of certiorari with respect to sovereign immunity issues pertaining to bankruptcy and confusion in the case law); *see also* Klee, Johnston and Winston, 52 Vand. L.Rev. at 1555 (suggesting that court might conclude that "section 106(a) effectively abrogates Eleventh Amendment immunity with respect to actions to remedy discriminatory practices brought against a state in bankruptcy court pursuant to section 525 of the Bankruptcy Code" because "the prohibition against discriminatory treatment goes to the heart of the Equal Protection Clause of the Fourteenth Amendment," which the Supreme Court has stated still effectively abrogates sovereign immunity.)

tive relief against a responsible official of NYSDH to prevent that official's continuing violation of a fundamental provision of the Bankruptcy Code: section 525(a)'s prohibition of certain kinds of discrimination contrary to the Bankruptcy Code's fresh start policy. The Debtor is not seeking retroactive monetary relief; he does not even need to be "Medicaid eligible" but for his employer's requirement that all of its staff physicians be Medicaid eligible. *Cf. In re Guiding Light Corp. v. Jindal (In re Guiding Light Corp.)*, 217 B.R. 493, 498–99 (Bankr.E.D.La.1998) ("*Guiding Light II*") (*Ex parte Young* inapplicable because plaintiff seeks retrospective monetary relief). There also is no "detailed remedial" scheme crafted by Congress to enforce section 525(a) of the Bankruptcy Code. *In re Guiding Light Corp. v. Louisiana Dep't of Health & Hosp's (In re Guiding Light Corp.)*, 213 B.R. 489, 492 (Bankr.E.D.La. 1997). Therefore, the clear exceptions to *Ex parte Young* do not apply.

The Commissioner argues that the Debtor nevertheless seeks relief that interferes with the state's "special sovereignty interests" because of the pervasive role that the State of New York plays in the Medicaid Program, and, therefore, that *Ex parte Young* should not apply. This is not, however, a case where the Court is asked to interfere with the state's review of potential abuses of the Medicaid Program or the Debtor's compliance with professional, operating guidelines. The Commissioner is merely trying to enforce the Reinstatement Agreement because the prepetition debt thereunder has not been paid following the commencement of the Debtor's chapter 7 case. *Cf. Guiding Light II*, 217 B.R. at 498 (debtor lacks property interest in funds held by state pending Medicaid investigation of fraud and willful misrepresentation); *Lawson Burich Ass'n, Inc. v. Axelrod (In re Lawson Burich Ass'n, Inc.)*, 59 B.R. 681, 689 (Bankr.S.D.N.Y.

1986) (sovereign immunity applies to prepetition contractual dispute over state's right to Medicaid reimbursements and receiver's operation of nursing home).

■ The Debtor seeks only to prevent the Commissioner from changing the status quo. It is well established in this Circuit that actions taken in violation of the automatic stay are void: "[T]he automatic stay is effective immediately upon the filing of the petition and any proceedings or actions described in section 362(a)(1) are void and without vitality if they occur after the automatic stay takes effect." *Eastern Refractories Co. v. Forty Eight Insulations, Inc.*, 157 F.3d.169, 172 (2d Cir.1998); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir.1994). NYSDH's unilateral action to call a default under the Reinstatement Agreement did not fall within the "police and regulatory" exception to the automatic stay under section 362(b)(4) of the Bankruptcy Code. It was essentially pecuniary, as it was NYSDH's first step in exercising the remedy of depriving the Debtor of his interest under the Reinstatement Agreement (*In re Psychotherapy and Counseling Center, Inc.*, 195 B.R. 522, 532 (Bankr.D.D.C.1996) (right under settlement agreement providing for uninterrupted Medicaid provider status is property of estate protected by automatic stay)) for his failure to pay his remaining obligation to NYSDH therein. *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000); *In re Psychotherapy*, 195 B.R. at 529, 533; *In re Rusnak*, 184 B.R. 459, 464–66 (Bankr.E.D.Pa.1995) (provider status revocation action is in state's pecuniary interest and is not covered by section 362(b)(4)).

Because NYSDH did not obtain relief from the automatic stay to call the default, the default letter was void and the Debtor remained on the "Medicaid eligible" list

after he obtained his discharge, a condition that he now seeks to maintain under section 525(a). *Cf. In re Moss,* 270 B.R. 333, 344–45 (Bankr.W.D.N.Y.2001) (bankruptcy court determined that it had jurisdiction to decide whether the automatic stay applied to debarment from the Medicaid Program but concluded that all relevant events to debarment occurred prepetition and, therefore, that the automatic stay did not apply).

### The Merits of the Debtor's Motion for Injunctive Relief

■ Having established that the Court has jurisdiction over this proceeding as to the Commissioner, the Debtor also has shown, on the undisputed facts, that he is entitled to an injunction preventing his removal from the "Medicaid eligible" list because of his nonpayment of the remaining amount due under the Reinstatement Agreement.

The potential for imminent and irreparable harm to Dr. Berkelhammer is clear. He will lose his job if injunctive relief to correct the Medicaid eligible list is denied. The harm to the Commissioner and NYSDH is far less clear. NYSDH did not seek to collect Dr. Berkelhammer's original obligation between 1992 and 1998; it appears that Dr. Berkelhammer's employment would not, on a going-forward basis, involve him with Medicaid patients or in the provision of Medicaid-reimbursable services; and the loss by Dr. Berkelhammer of his position at Kings County Hospital Center cannot benefit the state in respect of the provision of psychiatric services and, indeed, probably would be a loss to the state.[4] The Commissioner's

only interest appears to be to establish that she may unilaterally terminate an agreement providing for Dr. Berkelhammer's continued eligibility for the Medicaid Program, notwithstanding his bankruptcy, because of his failure to pay his prepetition obligation to NYSDH.

That payment-enforcement interest, however, conflicts with section 525(a) of the Bankruptcy Code, which provides in relevant part:

[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title ... solely because such ... debtor is or has been a debtor under this title, ... has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title....

The sole reason in the record for the Commissioner's termination of Dr. Berkelhammer from the "Medicaid eligible" list is his failure, as a result of his bankruptcy case, to pay the amount provided for in the Reinstatement Agreement, the consequences of which will be the loss of his employment. Any attempt by the Commissioner to remove[5] Dr. Berkelhammer from the Medicaid eligible list for such

---

4. The record shows that Dr. Berkelhammer as a staff psychiatrist performs court-ordered psychiatric evaluations of defendants in criminal proceedings in Kings, Queens and Richmond counties as well as treats prisoners for psychiatric problems.

5. As noted above, NYSDH's prior purported removal of the Debtor from the Medicaid list was void as a violation of the automatic stay. *Forty Eight Insulations,* 157 F.3d at 172.

reason therefore would violate section 525(a). *See In re Psychotherapy*, 195 B.R. at 530, 533–34. In that case, on similar facts, the Bankruptcy Court for the District of Columbia concluded that any postpetition termination of the debtor's Medicaid privileges because of a breach of his payment obligation under a nonrecourse settlement agreement with HHS would violate section 525(a):

> HHS's determination that the debtor is to be excluded from the program is going to have to involve more than simply rubber-stamping the settlement agreement. Otherwise, the proposed exclusion of the debtor would be based solely on the fact that the debtor failed to pay a dischargeable debt which is impermissible under § 525(a).

*Id.* at 534.

■ The Commissioner nevertheless argues that section 525(a) should not apply to these facts for a number of reasons. The first, that 28 U.S.C. § 959 required the chapter 7 trustee to pay the amount provided for in the Reinstatement Agreement consistent with his obligation to manage the property in his possession according to the requirements of state in law, is easily disposed of. Section 959's operating mandate does not require the chapter 7 trustee to pay the Debtor's prepetition debts, such as the Debtor's obligation under the Reinstatement Agreement.

■ The Reinstatement Agreement also is not an executory contract, whose benefits Dr. Berkelhammer could not receive unless he assumed the agreement

under section 365(a) of the Bankruptcy Code by curing all defaults under section 365(b), as the Commissioner argues. *In re Chateaugay Corp.*, 102 B.R. 335, 347 (Bankr.S.D.N.Y.1989) (if the only remaining obligation is the debtor's payment of money, contract is not executory). *See also In re Psychotherapy*, 195 B.R. at 525. As stated in *Gibbs v. Housing Authority of City of New Haven*, 76 B.R. 257, 262 (D.Conn.1983):

> At the time Gibbs filed her petition, the only obligation imposed upon the Authority was that of forbearance from further eviction proceedings. There remained no affirmative obligation on the Authority to do anything at all. Thus, the Authority had fully discharged its obligations, and the contract was not executory. The mere fact that one party could interfere with the complete discharge of the contract does not make it, for bankruptcy purposes, executory. A creditor may not make payment of a debt incurred before filing a condition of maintenance of the *status quo*, lest the entire thrust of the bankruptcy system be subverted,

the last sentence of which applies equally well to the Commissioner's argument under 28 U.S.C. § 959.[6]

■ NYSDH also argues that Dr. Berkelhammer's obligation to it under the Reinstatement Agreement, being nonrecourse, is not a "debt that is dischargeable" for purposes of section 525(a) of the Bankruptcy Code. This argument, too, fails. A "debt," which is defined under section 101(12) of the Bankruptcy Code as

---

6. At least one court has held, in any event, that section 525(a) of the Bankruptcy Code trumps the *cum onere* requirement of section 365(b) of the Bankruptcy Code. *Hiser v. Blue Cross of Greater Philadelphia (In re Saint Mary Hospital)*, 89 B.R. 503, 512 (Bankr. E.D.Pa.1988). *See also NextWave Personal Communications Inc. v. FCC*, 254 F.3d 130,

151 (D.C.Cir.2001); *Kings Terrace Nursing Home and Health Related Facility v. New York State Dept. of Social Services (In re Kings Terrace Nursing Home)*, 1995 WL 65531 at 14–15, 1995 Bankr.LEXIS 157 at 44–46 (Bankr.S.D.N.Y. January 26, 1995) *aff'd* 184 B.R. 200 (S.D.N.Y.1995).

a "liability on a claim," has a meaning coextensive with that of "claim" as defined in section 101(5) of the Code. *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). Congress adopted "the broadest possible definition of 'claim' in section 101(5) of the Bankruptcy Code," *id.* 495 U.S. at 558, 564, 110 S.Ct. 2126, so that a "claim" is "nothing more nor less than an enforceable obligation...." *Id.* 495 U.S. at 559 n. 4, 110 S.Ct. 2126. Rights to enforce nonrecourse contracts constitute "claims" and, therefore, "debts" under the Bankruptcy Code. *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991) (applying *Davenport* along with other statutory analysis [7]). *See also In re Psychotherapy,* 195 B.R. at 524, 529–30, in which, after noting that the nonrecourse settlement agreement could be enforced by its terms only by excluding the debtor from the Medicaid program, the court held that "[U]nder 11 U.S.C. § 525(a) HHS may not seek to revoke the debtor's Medicare and Medicaid provider agreements solely because the debtor has not paid a debt that is dischargeable in bankruptcy."

It is well established that certain types of nonrecourse claims, based on a perfected and enforceable lien or property interest nevertheless survive a section 727 discharge. *Johnson v. Home State Bank* thus states, "[A] bankruptcy discharge extinguishes only one mode of enforcing a claim—namely an action against the debtor *in personam*—while leaving intact another—namely, an action against the debtor *in rem.*" 111 S.Ct. at 2154. Therefore, a creditor's liens and property interests

"ride through" a chapter 7 case if not administered therein. *Id. See also In re Rivera,* 256 B.R. 828, 832–33 (Bankr. M.D.Fla.2000) (generally a chapter 7 discharge does not modify property rights); *In re Dabrowski,* 257 B.R. 394, 398, 413 (Bankr.S.D.N.Y.2001) (despite chapter 7 discharge, landlord may pursue *in rem* remedies because chapter 7 discharge only limits enforceability but does not extinguish the underlying debt).

However, unlike the bank in *Johnson v. Home State Bank,* NYSDH has no lien or property interest that it can proceed against *in rem* following the Debtor's discharge. *See Claussen v. Brookings Cty. (In re Claussen),* 118 B.R. 1009, 1016 (Bankr.D.S.D.1990) unperfected, inchoate lien dischargeable. The Commissioner must proceed against Dr. Berkelhammer personally to enforce NYSDH's rights under the Reinstatement Agreement for his failure to pay.

Moreover, it appears that section 525(a) of the Bankruptcy Code is not, by its plain terms, as limited as the related discharge-enforcement provision of section 524(a) of the Bankruptcy Code, which voids judgments on and provides for a statutory injunction against actions to enforce "a *personal* liability of the debtor." 11 U.S.C. §§ 524(a)(1)–(2) (emphasis added). Neither section 525(a) (which refers to a "dischargeable" debt), section 727(b) (which describes the chapter 7 discharge as extending to all prepetition "debts") or section 101(12) of the Bankruptcy Code (which defines "debt" as "liability on a claim") contain the "personal" limitation found in section 524(a). *See Lindsey, Ste-*

---

7. Section 102(2) of the Bankruptcy Code establishes as a "rule of construction" that the phrase "claim against the debtor" includes "claim against property of the debtor." A fair reading of sec. 102(2) is that a creditor who, like the Bank in this case, has

a claim enforceable only against the debtor's property nonetheless has a "claim against the debtor" for purposes of the Code.
*Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 2155, 115 L.Ed.2d 66 (1991).

*phenson & Lindsey v. FDIC* (*In re Lindsey, Stephenson & Lindsey*), 995 F.2d 626, 628–29 (5th Cir.1993), *cert. denied,* 510 U.S. 1111, 114 S.Ct. 1053, 127 L.Ed.2d 374(1994): "The Code defines 'debt' as a 'liability on a claim,' not *'personal'* liability on a claim. 11 U.S.C. § 101(12). 'Personal liability' is a subcategory of 'liability.' Although a nonrecourse note stipulates no personal liability it *does* impose a legal obligation." (Emphasis in original.)

Therefore, while the more narrowly drafted statutory injunction in section 524(a) enables valid and enforceable liens and other property interests to ride through chapter 7 on an *in rem* basis consistent with established precedent [8] (so that, in that sense, they are not "dischargeable"), section 525(a) should be read to prohibit governmental units from discriminating against a debtor because of the failure to pay such a debt. *See In re Claussen,* 118 B.R. at 1119–20 (section 525 would protect debtor from county's statutory lien even had it been timely perfected); *see also In re Couture,* 225 B.R. 58, 64–65 (D.Vt.1998) (Sessions, J.) (although "It is crystal clear ... that a discharge only prevents a creditor from proceeding against the debtor on the debt as a personal liability," exercise of public housing authority's *in rem* eviction rights violated section 525(a)); *Stoltz v. Brattleboro Housing Auth.* (*In re Stoltz*), 259 B.R. 255, 259, 263–64 (D.Vt.2001) (Murtha, J.) (same); *In re Gibbs,* 76 B.R. at 263 (Cabranes, J.) (applying section 525(a) to public housing landlord's post-discharge attempt to evict debtor).

The foregoing application of section 525(a) of the Bankruptcy Code to preclude the Commissioner's removal of Dr. Berkelhammer from the "Medicaid eligible" list, despite the nonrecourse nature of NYSDH's enforcement right under the

Reinstatement Agreement, is further supported by the language and policy of section 525(a). A primary objective of the Bankruptcy Code was to give debtors a "fresh start free from the worries and pressures of oppressive debt," H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977) at 125, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6086, and in light of that purpose the House and Senate Reports "clearly indicate that Congress intended that the section [525] not be read narrowly." *In re Stoltz,* 259 B.R. at 263. Section 525(a) codifies *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), which held that a state's refusal to renew a driver's license impermissibly frustrates bankruptcy's fresh start policy. S.Rep. No. 989, 95th Cong., 2d Sess. (1978) at 81, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5867; 4 Lawrence P. King, *Collier on Bankruptcy* ¶ 525.01 (15th ed.2002). The enumeration of various forms of discrimination in section 525 is not exhaustive. *Id.* The legislative history demonstrates Congress' intent to provide courts with flexibility: "The [*Perez*] doctrine is a developing doctrine, and its precise ultimate contours are not yet clear, more case law will undoubtedly develop the extent of the discrimination that is contrary to bankruptcy policy." H.R.Rep. No. 595 at 165, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6126. Congress intended to allow courts to continue "developing the *Perez* rule." S.Rep. No. 989 at 81, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5867. "This section permits further development to prohibit actions by governmental or quasi-governmental organizations ... that can seriously affect the debtors' livelihood or fresh start...." *Id.*

Courts *have* found specific limitations on the broad reach of section 525(a). *See*

---

**8.** *See Long v. Bullard,* 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886).

*Goldrich v. New York State Higher Education Services Corp.* (*In re Goldrich*), 771 F.2d 28, 31 (2d Cir.1985) (in light of types of governmental actions listed in section 525 and legislative history regarding inapplicability of section to credit determinations, section 525(a) does not apply to request for new student loan); *Johnson v. Edinboro State College,* 728 F.2d 163, 166 (3d Cir.1984) (section 525(a) does not apply to refusal to provide transcript to debtor whose student loan was expressly nondischargeable under 11 U.S.C. § 523(a)(8)); *but see* 11 U.S.C. § 525(c); *University of Alabama v. Howren* (*In re Howren*), 10 B.R. 303 (Bankr.D.Kan.1980) (section 525(a) applies to refusal to provide transcript even if student loan is nondischargeable). However, given the clear fresh start implications here, section 525(a) should apply, despite the drafting of the Reinstatement Agreement as a nonrecourse obligation, to prevent the deprivation of Dr. Berkelhammer's job solely for his failure to pay NYSDH. *See NextWave Personal Communications Inc. v. FCC,* 254 F.3d 130, 152 (D.C.Cir.2001) (section 525(a) was violated despite the FCC's contention that it sought "only to revoke [the debtor's] licenses, not to collect on the debt, and insofar as timely payment is a condition to license retention, it is a regulatory requirement, not a dischargeable debt").

The Commissioner's last argument is that it is inequitable to permit Dr. Berkelhammer to remain on the "Medicaid eligible" list without paying his debt to NYSDH. Although there is authority in analogous cases for this proposition (*see, e.g., In re Bacon,* 212 B.R. 66 (Bankr. E.D.Pa.1997)), the better view is that the plain language as well as the policy of section 525(a) place this burden on governmental units like NYSDH that are both a creditor and a provider of government grants and privileges. *See In re Stoltz,*

259 B.R. at 262–64. Because it appears that Dr. Berkelhammer will not be taking funds from NYSDH, moreover, but seeks to remain on the "Medicaid eligible" list simply to keep his job, the requested relief goes to the fundamental policy of section 525(a) of the Bankruptcy Code: to prevent discrimination that would preclude a debtor's fresh start. *See In re Goldrich,* 771 F.2d at 31 (recognizing Congress' intention in section 525(a) to protect against government action "that can seriously affect the debtors' livelihood").

## CONCLUSION

Accordingly, Defendant's motion to dismiss is denied and the Debtor's motion for summary judgment and injunctive relief against the Commissioner is granted; provided, that such relief shall be without prejudice to the Commissioner's right to determine, in accordance with NYSDH and the state's administrative procedures, that Dr. Berkelhammer may be excluded from the Medicaid Program on other grounds, independent of his default under the Reinstatement Agreement.

An appropriate order will follow.